HERGET, Judge.
Defendants Rufus L. Addison and his wife, Mrs. Eldred H. Addison, were the owners of a lot in the City of Hammond, Tangipahoa Parish, Louisiana, at the junction of U. S. Highways 190 and 51. The lot had a frontage of 100 feet on Highway *546 190 and a depth of 200 feet along U. S. Highway SI. The improvements on the lot consisted of a one-story frame building used as a combination cafe, filling station and living quarters. In addition, there was a garage and a barbecue pit. The State of Louisiana through the Department of Highways for the purpose of completing a twenty-four foot concrete paved “controlled access” highway along the already existing graveled blacktopped U. S. Highway 51 where it joins U. S. Highway 190 expropriated forty per cent of Defendants’ property located at the southeast corner of this junction. As found by the Trial Judge in his written reasons for judgment:
“5. The property acquired by the State of Louisiana through the Department of Highways by the order of expropriation rendered in this cause includes a strip of land sixty-five feet in width along the entire west side, a strip of land along the north side of the property measuring 8.71 feet at the easternmost limit of the property with an additional area rounding the curve, making a total area expropriated of approximately 8,000 square feet, or forty per cent of the total area of the property before the taking. The area taken includes the entire area of the property adjacent to public highways.
“6. The Department of Highways of the State of Louisiana, in connection with the construction of the Hammond-Ponchatoula By-Pass, State Project No. 17-04-09 and Federal Aid Project F-36(7) will construct around the property of the defendant not taken under the order of expropriation, a barrier curve (curb) which will extend along the present line of U. S. Highway 190 and Highway 51 (Thomas Street) 80.77 feet east from the center line and a barrier curve (curb) running along the west side of the property • 110.56 feet from the center line of U. S. Highway 51. Beyond this point there would be a roll over curve (curb) extending the remaining distance along the Addison property. There would be allowed along the east side, located at or near the east edge of the property of the defendants, an access way from U. S. Highway 190 and U. S. Highway 51, not more than thirty feet in width and there would also be allowed to the defendants an entry way on the west of the property and into the Hammond By-Pass Highway an entry way also not over thirty feet in width, which could be located at any point along the roll over curve (curb) which would be within the south 93 feet of the property of the defendant. Under highway regulations, no paving of the highway right of way would be permitted except at the entry points and the barrier curve (curb) would be of such height as to prevent crossing by motor vehicles.”
Located on the property expropriated is the main building and residence, with the garage and barbecue pit being situated on the sixty per cent of the lot left to Defendants.
The State having deposited in the Registry of the Court the sum of $18,639 as compensation for the property taken including severance damage to the remaining property, appealed to this Court from a judgment of the Trial Court awarding Defendants the sum of $34,800. The sole question presented by this appeal is therefore one of quantum.
The State called for its witnesses as to the valuation of the property taken Mr. Max J. Derbes, Sr. and Mr. Harold Tra-han ; whereas, the Defendants for this purpose called Mr. Edward J. Deano, Mr. Robert O. Farris and Mr. Thomas G. Womack, Sr.
In connection with the testimony of Mr. Rufus L. Addison, subject to the objection by Plaintiff, the Defendants offered in evidence the deed by which they acquired this property on August 16, 1949 from Mr. C. H. *547 Felder for a consideration of $30,000 and the testimony of Mr. Addison that, upon the acquisition for income tax purposes and for the purposes of depreciation, the sale was broken down by placing a value on the land of $14,050; the buildings $12,000; the refrigeration and counters and equipment on the floor $2,000; kitchen equipment $1,500; furniture and fixtures $450; making a total of $30,000 of which amount $26,050 represented the allocation for the land and building. Subsequent to this purchase the Defendants placed a concrete slab apron in front of the building at a cost of $1,400. Counsel for the State objected to the introduction of this evidence on the ground that the purchase price paid by the expropriatee is not evidence of the market value of the property sought to be expropriated.
Though counsel for the Plaintiff objected to Defendants’ introduction of the sale, Mr. Derbes, an expert appraiser called by the Plaintiff, testified that in making his appraisal he took into consideration this sale by which Defendants acquired the property for $30,000 in 1949. He reviewed the recorded records of deeds and ascertained that Defendants’ vendor, Mr. Felder,, had acquired the property on June 4, 1946 for the sum of $12,000 and subsequent to his purchase he had added the garage and the barbecue pit and therefore Mr. Derbes attempted to determine the basis for the increase in the value of the property. He obtained information to the effect that at the time of the purchase by Mr. Addison there was located on the premises slot machines and it was, by implication, his view that the increase in the sale price was attributable to the presence of the slot machines.
Mr. Addison testified that there were located on the premises slot machines which were removed at the end of the year of 1949 and while there was some income from these contrivances for a period of three months, they had not been in his place of business since 1950 and they did not enter into his determination to purchase the premises. Thus, the implication was made but never proven that Defendants paid the enhanced price in order to purchase a number of slot machines which were on the property at the time. Without contemplating the income value of the slot machines (no experts were qualified as to the take of a one-armed bandit at the trial), it does appear that the Defendants in purchasing the property intended to buy and pay for not only the land and improvements but the equipment, whatever it may truly have been, in addition to good will and .the entire business. Though the purchase price paid by the expropriatee is not evidence per se of the market value, certainly, in the absence of showing that the sale was fictitious, it is relevant evidence to be considered with other evidence in ascertaining the true market value, and in connection with the testimony of Defendants’ experts it does not detract from the valuations placed on the property by them in ascertaining the value of the property, for the true criterion of value is the market value of the property at the date of the institution of the expropriation suit. Louisiana Highway Commission v. Boudreaux, 19 La. App. 98, 139 So. 521; Murff v. Louisiana Highway Commission, La.App., 146 So. 328; Central Louisiana Electric Company, Inc. v. Leonards et al., La.App., 65 So.2d 631.
In its written reasons for judgment the Trial Court said:
“IQ. * * *
“ * * * Mr. Derbes, a real estate dealer from New Orleans valued the land and improvements at $14,313.00, the damages in the sum of $4,326.00 making a total estimate of $18,639.00 Mr. Trahan, a real estate dealer in Hammond, La., appraised the property before the taking at $22,466.00 and after the taking at $18,639.00.
“The defendant put on three witness, (witnesses) Edward J. Deano, who is a real estate dealer in New
*548 Orleans and Mandeville, La., and has been in the business for some time. He gave an itemized appraisal of the property as follows: Value of improvements less depreciation, $10,160.00; Value of land by comparison, $30,000; value of whole: $40,160.00; value of the remainder after the taking, $5400.00; Value of the taking and damages $34,800.00.
“Mr. Robt. O. Farris, who is a real estate dealer in Hammond appraised the value of the property and the taking at $37,000.00; another real estate dealer, Mr. T. G. Womack, appraised the property as follows: Land, $25,000.00; the restaurant and living quarters at $12,600.00; the double concrete block garage at $2,260.00; the Bar-B-Q pit at $250.00, making a grand total of $40,110.00, less the value of the land remaining $3000.00 which makes a total value of $37,110.00.”
Counsel for appellant strenuously maintains that we should give no probative value to the testimony of Mr. Robert O. Farris and Mr. T. G. Womack, Sr. appraisers for the Defendants, because, in their testimony, they gave no reason or basis for their valuations. According to the record both of these gentlemen are in the real estate business in the locality and, of necessity, are capable of expressing expert views on the valuations of property in that vicinity. While we have in many instances iterated and reiterated that the best and most satisfactory method by which the ascertainment of the market value may be obtained is by the use of comparables, in the absence of such use specifically, the opinions expressed by realtors or experts in appraisals without the use of comparables does not stigmatize their testimony as being of no probative value but goes to the effect to be given to such testimony.
Mr. Derbes valued the restaurant and residence at $11,250, depreciated it twenty per cent or $2,250, leaving a net depreciated value thereon of $9,000; he appraised the barbecue pit at $325; the garage at $2,328 and the paving at $813, which gave a net value less the depreciation of $12,-466. He valued the land which measured 100 feet by 200 feet at fifty cents (.50^) per square foot or $10,000, he added this to the $12,466, making an overall total of $22,-466. In arriving at the damages sustained by Defendants he placed a value of $4,000 or forty per cent of the whole lot or land value to which he added the paving thereon appraised by him at $813 and thereto added the sum of $9,000 representing the depreciated value of the restaurant and residence, making a total of $13,813. He then valued the severance damage as follows: placing a valuation of $6,000 on the remaining sixty per cent of the lot he added thereto his valuation of $2,328 for the garage; $325 for the barbecue pit and, considering there was a severance damage of fifty per cent of this total value of $8,653, he then accorded $4,326 as severance damage to the remainder of the property which, added to the sum of $13,813 together with an allowance of $500 for the business sign on the front of the property, brought the total to $18,639 representing his opinion of the total damages sustained by Defendants. An analysis of his figures thus reveals that he allowed $7,-000 as representing the value of the land taken and severance damage to the remainder of the land and $11,639 for improvements and severance damage to the remainder of the improvements.
Mr. Deano valued the building at $11,-160; the garage at $2,352; the barbecue pit at $300; the slab apron of concrete in front of the building at $1,400, or a total of $15,212. He then depreciated the value of the building which had been fixed by him at $11,160 forty per cent or $4,646 which he deducted from the value accorded thereto and he depreciated the value of the garage 25% or $588, making a total depreciation of $5,052 which he subtracted from the $15,212, leaving a replacement cost of im *549 provements, less depreciation, of $10,160. Using comparables which he referred to in his testimony he placed a value of $1.50 per square foot on the land, giving a value of $30,000 which added to the value of the depreciated cost of improvements amounted to the sum of $40,160. In arriving at the severance damage to the remainder of the lot, that is sixty per cent thereof, he fixed the valuation on the 12,000 square feet remaining at $1.50 per square foot or $18,-000. Because of the limited access to the remainder of the lot after the taking and because of the odd shape of the lot which would be left and the change of the traffic pattern, he was of the opinion that the remaining portion of the lot left to Defendants would be unadaptable for a filling station, its best and highest use, and that a depreciation of seventy per cent or $12,600 was evident, leaving a value of the remaining portion of the lot at $5,400 which, deducted from the total of $40,160 previously arrived at as the total value of the lot and depreciated improvements, leaves a balance of $34,760 which he fixed at $34,800 as the total damages sustained by Defendants as a result of this expropriation. There is an inconsequential difference between Mr. Deano and Mr. Derbes in the appraisals of the loss to Defendants of improvements; Mr. Deano having valued this loss at $10,-160 and Mr. Derbes at $11,639, so that the main difference in their total appraisals is pointed at their views in regard to the value of the land actually taken and the severance damage to the remainder' — Mr. Deano fixing this value at some $24,000 and Mr. Derbes at $7,000. In justification of the land value of the subject property fixed by Mr. Derbes at .50$ per square foot and by Mr. Deano at $1.50 per square foot, both of these gentlemen relied on comparable sales, which in two instances were of the same property, (1) a sale on August 15, 1957 of what is known as the Winn-Dixie property for the price of .84$ per square foot; and (2) a sale by Sam Martin to Paul Barlow of a lot 100 feet by 100 feet for $14,000 or $1.40 per .square foot.
In analyzing the comparability of these properties to the subject property Mr. Der-bes was of the opinion that both the Winn-Dixie and Barlow properties were worth in excess of the value of the subject property because of their location and availability for commercial use. Mr. Deano, on the other hand, was of . the opinion that the Winn-Dixie property was not in the same category with the subject property as it faced a narrow highway and needed considerable filling before improvements could be placed thereon and he was of the opinion that the Barlow property was not as valuable as the subject property because of its location.
The Defendants called as their witness Mr. Ben Puyper who testified that he was a general salesman for the Standard Oil Company and that in such capacity he advised that company in regard to locations and development of filling stations. It was his opinion that the remaining portion of the lot left to Mr. and Mrs. Addison would not be of sufficient size to place thereon a filling station with all -the necessary appurtenances and because of the impairment of ingress and egress resulting from the placing of the barrier curb previously referred to making the property inaccessible, it would be such a location as he would advise his company not to make a loan on or assist in obtaining a loan for the purpose of building a filling station. Despite the testimony of Mr. Derbes to the contrary, this testimony of Mr. Puyper, an expert in this field, should be accorded great weight. Especially does the unavailability of a loan for a filling station on the remainder of the property appear to be significant when it is remembered that prior to the expropriation Defendant did, in fact, obtain a loan for this purpose.
The Trial Judge, who heard and saw the witnesses, familiar with the subject property and the comparables referred to by the experts, having a personal knowledge of the experts and their qualifications, giving consideration to all of the testimony, was of *550 the 'opinion that Defendants had in fact sustained damages totaling $34,800 as a result of this expropriation. Upon reviewing the evidence we are in accord with his findings.
For these reasons the judgment of the Trial Court is affirmed.
Judgment affirmed.